## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CHERRY RIDER, trustee of the Cherry )
Rider Family Trust and R.W. and CATHY )
LUCAS, co-trustees of the R.W. Lucas and )
Cathy Lucas Living Trust, individually and )
as representative plaintiffs on behalf of )
persons or concerns similarly situated, )
                                )
                     **Plaintiffs,** )      **CIVIL ACTION**
                                  )
v. )      **No. 23-1274-KHV**
                                  )
OXY USA, INC.; MERIT ENERGY )
COMPANY, LLC; and MERIT )
HUGOTON L.P, )
                     **Defendants.** )
_____)

## MEMORANDUM AND ORDER

On December 29, 2023, Cherry Rider, as Trustee of the Cherry Rider Family Trust, and R.W. Lucas and Cathy Lucas, as Co-Trustees of the R.W. Lucas and Cathy Lucas Living Trust, filed this putative class action against OXY USA, Inc. ("Oxy"), Merit Energy Company, LLC and Merit Hugoton L.P. (collectively, "Merit"). Plaintiffs allege that by taking improper deductions from royalty payments that Merit made to plaintiffs, defendants breached a stipulation of settlement which the District Court of Stevens County, Kansas entered in Littell v. OXY USA, Inc., No. 98-CV-51. See Class Action Complaint (Doc. #1) filed December 29, 2023.

This matter is before the Court on Plaintiffs' Motion For Class Certification (Doc. #89), Defendants' Motion To Strike The Expert Opinions Of Paul Saas As An Improper Rebuttal Witness (Doc. #90) and Defendants' Daubert Motion To Exclude The Opinions Of Paul Saas (Doc. #91), all filed January 9, 2025. For reasons stated below, the Court overrules plaintiffs' motion for class certification. It overrules as moot defendants' motions to strike and exclude.

**<u>Legal Standard</u>**

The class action is an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only. <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 348 (2011). The Court has considerable discretion in making class certification decisions. <u>See</u> <u>Tabor v. Hilti, Inc.</u>, 703 F.3d 1206, 1227–28 (10th Cir. 2013). It must, however, conduct a "rigorous analysis" to determine whether the putative class satisfies the requirements of Rule 23, Fed. R. Civ. P. <u>Comcast Corp. v. Behrend</u>, 569 U.S. 27, 33 (2013); <u>Dukes</u>, 564 U.S. at 350–51. Rule 23 "does not set forth a mere pleading standard." <u>Dukes</u>, 564 U.S. at 350. Rather, the Court's analysis will frequently overlap with the merits of plaintiffs' claims. <u>See</u> <u>Comcast</u>, 569 U.S. at 33–34; <u>Dukes</u>, 564 U.S. at 351. This is so because determining whether to certify a class typically involves considerations that are enmeshed in the factual and legal issues which comprise plaintiffs' cause of action. <u>Comcast</u>, 569 U.S. at 34.

As the party seeking class certification, plaintiffs have the strict burden to affirmatively prove that the proposed class satisfies the requirements of Rule 23. <u>Dukes</u>, 564 U.S. at 351. In doing so, plaintiffs must first satisfy the prerequisites of Rule 23(a): they must demonstrate that (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law or fact are common to the class, (3) the claims of representative parties are typical of class claims and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, plaintiffs must demonstrate that the proposed class action fits within one of the categories described in Rule 23(b).

Here, plaintiffs seek to proceed under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action is "superior to other available methods for fairly and efficiently

adjudicating the controversy."  In determining predominance and superiority under Rule 23(b)(3), the Court considers the following factors:

    (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

    (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

    (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

    (D)    the likely difficulties in managing a class action.

Id.

## **Factual Background**

Plaintiff Cherry Rider is trustee of the Cherry Rider Family Trust.  Plaintiffs R.W. Lucas and Cathy Lucas are co-trustees of the R.W. Lucas and Cathy Lucas Living Trust.  The trusts own mineral and royalty interests in lands in the areal confines of the Kansas Hugoton Gas Field.

## I.    The **Littell** Settlement

On November 13, 1998, Bonnie Beelman, Opal Littell and Cherry Rider, as co-trustees of the Opal Littell Family Trust, filed suit against Oxy in the District Court of Stevens County, Kansas in a case captioned Littell v. OXY USA, Inc., No. 98-CV-51.  In that case, plaintiffs alleged that Oxy had failed to properly calculate and pay required royalty payments under oil and gas leases within the Kansas Hugoton Gas Field.  On March 13, 2001, the Stevens County court certified the case as a class action.  In January of 2007, the class action plaintiffs and Oxy entered into a stipulation of settlement (the "Settlement").

The Settlement defined class members as follows:

All persons or concerns owning mineral interests in lands located in the areal confines of the Kansas Hugoton Gas Field, burdened by oil and gas leases owned in whole or in party by defendant with respect to gas production from above the

base of the Panama-Council Grove Field, whose royalty payments have been reduced by a "gathering/compression" deduction or "marketing deduct" identified on the monthly gas revenue detail sent by defendant to each such member.

Stipulation Of Settlement (Doc. #1-1) filed December 29, 2023 at 14.

On March 4, 2008, the Stevens County court approved the Settlement between the participating class members and Oxy, and it entered a journal entry of judgment.[1]  Under the terms of the Settlement, Oxy would pay $16,700,000, plus accrued interest, into the settlement fund. The final payment schedule contained 4,307 owner numbers, corresponding to approximately 2,600 participating class members.

The Settlement set forth specific limitations on Oxy's future royalty payments to participating class members and their successors.  Section 2.6 of the Settlement states that Oxy shall not "diminish[] or reduce[] by any charge other than fifteen cents per mmbtu ($0.15/mmbtu) for Gathering Charges, taxed owed by them or the actual cost of transporting such gas on a transmission pipeline."  Id. at 13.  Section 7.3 of the Settlement provides that the agreement "shall be binding upon" participating class members and their successors and assigns.  Id. at 22.  Further, it states that an assignment does not relieve any party of its obligations under the Settlement.  Id.

Cherry Rider, as Trustee of the Cherry Rider Family Trust, is a participating class member in the Settlement and remains a named plaintiff and class representative in that case.  R.W. Lucas is also a participating class member under the Settlement.  The R.W. Lucas and Cathy Lucas Living

---

[1]       The Settlement defines "Participating Class Members" as "all Class Members who do not exclude themselves as provided for in the Notice Order."  Stipulation Of Settlement (Doc. #1-1) at 7.  The Settlement contains two definitions of "Oxy."  Generally, when used in the Settlement, "Oxy" means Oxy and "its parents, subsidiaries, and all affiliated companies."  Id. at 5.  When used in connection with the "Settled Claims," "Oxy" also includes all present and former successors and assigns.  Id.  The "Settled Claims" are "any and all claims . . . based on any facts, circumstances, transactions, events. . . which occurred at any time prior to July 1, 2007, that were or could have been properly alleged in the Action and that in any way related to the Leases, OXY's operation of the Leases, or OXY's failure to operate the Leases."  Id. at 8–9.

Trust is the successor in interest to R.W. Lucas.

## II.    Merit Acquires Oxy's Leases

In May of 2014, Merit acquired Oxy's assets in the Kansas Hugoton Gas Field and took over operation of Oxy's oil and gas leases which are subject to the Settlement.  At that time, Oxy (1) informed Merit about the Settlement; (2) identified royalty owners who were participating class members, as well as those that were not; and (3) provided Merit information regarding how it calculated royalty payments to participating class members, including information on limitations in the deductions.  Plaintiffs allege that since May of 2014, participating class members and their successors have received royalty payments from Merit or a related entity which contain improper deductions under Section 2.6 of the Settlement.

## III.    Procedural History

On April 27, 2023 in the District Court of Stevens County, plaintiffs filed a motion to enforce the Settlement against Merit as successor in interest to Oxy.  On May 26, 2023, Merit filed a notice of removal to this district.  See Littell v. OXY USA, Inc., No. 23-1103 (D. Kan.).  The Honorable Holly L. Teeter sustained plaintiffs' motion to remand, finding that the federal court lacked jurisdiction because the Littell case, which was filed in 1998, commenced before the Class Action Fairness Act, 28 U.S.C. § 1332(d), went into effect.[2]  Order, Littell, No. 23-1103 (Doc. #21

---

[2]    The Class Action Fairness Act, which "expanded the subject matter jurisdiction of federal courts over class actions in which at least one plaintiff class member was diverse in citizenship from the defendant and where the amount in controversy exceeded $5 million," applies to any case commenced on or after February 18, 2005.  Pritchett v. Off. Depot, Inc., 420 F.3d 1090, 1092 (10th Cir. 2005).  A case commenced in state court before February 18, 2005 (when Congress enacted the Class Action Fairness Act) is not "recommenced" post-Class Action Fairness Act by the act of removal after February 18, 2005.  See id. at 1094–97.  Here, the class action commenced in state court in 1998, and defendants removed it to this district in 2023.  Judge Teeter held that because the class action commenced before the Class Action Fairness Act went into effect, the Class Action Fairness Act could not be the basis for federal jurisdiction.  For that reason, the court
(continued. . .)

filed Aug. 22, 2023).

On remand to Stevens County, plaintiffs filed a renewed motion to enforce. On December 5, 2023, the Stevens County court overruled plaintiffs' motion because the judgment which approved the Settlement had become dormant under Kansas law. On February 8, 2024, plaintiffs appealed. The Kansas Court of Appeals has not yet issued an opinion in the matter. See Littell v. Merit Energy Co., No. 127221 (Kan. Ct. App. appeal docketed Feb. 8, 2024).

On December 29, 2023, plaintiffs filed this suit. Plaintiffs claim that both Merit and Oxy breached the Settlement by taking improper deductions from royalty payments in excess of what the Settlement allowed. Plaintiffs claim that Merit is a successor or assign of Oxy and is bound by the Settlement, including the limitations on deductions. Plaintiffs assert that Oxy also breached the Settlement because Section 7.3 provides that no assignment relieves Oxy of its obligations under the agreement.

On January 9, 2025, plaintiffs filed their motion for class certification. See Plaintiffs' Motion For Class Certification (Doc. #89). That same day, defendants filed motions to strike or exclude the testimony of Paul Saas. See Defendants' Motion To Strike (Doc. #90); Defendants' Daubert Motion To Exclude (Doc. #91).

### Analysis

Before the Court addresses the requirements for class certification, it addresses defendants' motions to strike or exclude the testimony of Paul Saas.

## I.     Defendants' Motions To Strike Or Exclude

Defendants argue that the Court should strike the expert testimony of Paul Saas because

---

[2] (. . .continued)
lacked subject matter jurisdiction over the case, and Judge Teeter remanded it. Order, Littell, No. 23-1103 (Doc. #21).

(1) during discovery, plaintiffs stipulated that they would not designate any expert in support of their motion for class certification and (2) after defendants designated three experts, plaintiffs improperly designated Saas as a "rebuttal" expert in support of class certification.  In the alternative, defendants argue that the Court should exclude Saas's expert testimony because (1) he does not have the requisite knowledge or experience to provide expert opinions on issues related to class certification and (2) his methodology to determine class members is not reliable.

In their motion to strike, defendants acknowledged that plaintiffs did not attach Saas's report to their motion for class certification or reference his opinions in the motion.  Nevertheless, defendants asserted that "it is obvious that [plaintiffs] *will* rely on the Saas opinions" in their reply. Defendants' Motion To Strike (Doc. #90) at 7 (emphasis added).  In their reply, plaintiffs state that "there is no present need for Plaintiffs to present testimony from their rebuttal expert."  Reply To Defendants' Response In Opposition To Plaintiffs' Motion For Class Certification (Doc. #104) filed May 9, 2025 at 3.  Plaintiffs did not present Saas's report or reference his opinions in their reply.  Because plaintiffs did not—and do not—rely on Saas to support their motion for class certification, defendants' motions to strike and/or exclude his testimony are moot.  The Court therefore overrules the motions.

## II.    Plaintiffs' Motion For Class Certification

Plaintiffs seek class certification under Rule 23(b)(3) for the purpose of asserting common claims for breach of contract against Oxy and Merit regarding royalty payment obligations. Defendants raise two initial issues related to plaintiffs' proposed class definition: ascertainability and standing.  Specifically, defendants argue that to ascertain class members under the proposed definition, they would need to conduct an individualized land-ownership analysis to determine who has standing to assert a claim for breach of the Settlement.  Because the Tenth Circuit treats

ascertainability as a sub-requirement of numerosity, the Court considers defendants'

ascertainability arguments in that section.[3] Evans v. Brigham Young Univ., No. 22-4050, 2023

WL 3262012, at *5 (10th Cir. May 5, 2023) (citing Rex v. Owens ex rel. Oklahoma, 585 F.2d 432,

436 (10th Cir. 1978)).

      A.    Standing

Plaintiffs ask the Court to certify the following class:

> All persons or entities to whom Merit Energy Company, LLC, Merit Hugoton LP, and/or any related or affiliated entity (collectively "Merit") has paid royalties at any time since December 2, 2017, under oil and gas leases in the Kansas Hugoton Field that were assigned to Merit by OXY USA, Inc. in or about 2014, except for those persons or entities who have received royalty payments from Merit exclusively for interests now or previously held by any of the 19 persons or entities who opted out of the class action settlement approved by the District Court of Stevens County, Kansas, on March 4, 2008, in the case of Opal Littell, et. al v. OXY USA, Inc., Case No. 98-CV-51, and excluding the United States of America insofar as its mineral interests are managed by the Office of Natural Resources Revenue.

Plaintiffs' Motion For Class Certification (Doc. #89).

Article III standing is a threshold matter central to the Court's subject matter jurisdiction.

See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997) (Rule 23 "must be interpreted in

keeping with Article III constraints"); Vallario v. Vandehey, 554 F.3d 1259, 1269 n.7 (10th Cir.

2009) (class certification analysis must begin with Article III standing).  Plaintiffs bear the burden

of showing that Article III standing exists.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 559–60

(1992).  To have standing, plaintiffs must show that (1) they suffered an injury in fact, i.e. an injury

that is sufficiently concrete and particularized, actual or imminent, not conjectural or hypothetical,

(2) the injury is fairly traceable to defendants' conduct and (3) the injury is likely to be redressed

---

[3]    By contrast, some circuits have found that ascertainability is better addressed under the predominance and superiority requirements of Rule 23(b)(3).  See Mullins v. Direct Digital, LLC, 795 F.3d 654, 658 (7th Cir. 2015).

by a favorable decision.  Id. at 560–61. At the class certification stage, standing exists if at least one named plaintiff meets the requirements.  DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1198 (10th Cir. 2010).   Here, defendants do not challenge that at least one named plaintiff has standing to bring suit.  At this stage, plaintiffs have standing to proceed.

B.    Rule 23(a) Requirements

As noted, Rule 23 governs class certification, and plaintiffs have the strict burden to affirmatively prove that the proposed class satisfies the requirements of Rule 23.  Dukes, 564 U.S. at 351.  Under Rule 23(a), plaintiffs must first demonstrate that (1) the class is so numerous that joinder of all members is impracticable; (2) questions of law or fact are common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).  Defendants argue that plaintiffs' proposed class does not meet the commonality, typicality and adequate representation requirements of Rule 23(a).

The commonality and typicality requirements "tend to merge;" "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Dukes, 564 U.S. at 349 n.5.  Commonality and typicality also "tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." Id.  Even so, the Court addresses each requirement under Rule 23(a) separately.

1.    Numerosity

Rule 23(a)(1) requires plaintiffs to show that "the class is so numerous that joinder

of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.  Gen. Tel. Co. of Nw., Inc. v. EEOC, 446 U.S. 318, 330 (1980).  Plaintiffs must produce some evidence or otherwise establish by reasonable estimate the number of class members who may be involved. Tripp v. Berman & Rabin, P.A., 310 F.R.D. 499, 504 (D. Kan. 2015).

As noted, the Tenth Circuit treats ascertainability as a sub-requirement of numerosity.  Rex, 585 F.2d at 436.  To show numerosity, "there must be presented some evidence of established, ascertainable numbers constituting the class in order to satisfy even the most liberal interpretation of the numerosity requirement."  Id.  Numerosity is essential because the "district court cannot determine whether a proposed class satisfies the Rule 23 requirements without a way to identify absent class members."  Evans, 2023 WL 3262012, at *5 (quoting 2 Joseph M. McLaughlin, McLaughlin on Class Actions § 4:2 (19th ed. 2019)).  The Court may "properly look below the surface of a class definition to determine whether the actual process of ascertaining class membership will necessitate delving into individualized or subjective determinations."  Id.; see also id. at *6 (from tuition records alone, court could not ascertain class members without individualized inquiries).

The Tenth Circuit has not adopted a standard for ascertainability.  Id. at *8.  Even so, it "allow[s] district courts to consider [out-of-circuit standards] as part of their discretion to grant or deny class certification."  Id.  Generally, courts apply the standards adopted by the Third Circuit or the Seventh Circuit.  See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig., No. 17-MD-2785-DDC, 2020 WL 1873989, at *9–12 (D. Kan. Feb. 27, 2020) (discussing both standards).  The Third Circuit requires that (1) the class be objectively defined and (2) a reliable and administratively feasible mechanism exists for determining whether putative

class members fall within the class definition.  Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 353 (3d Cir. 2013).  By contrast, the Seventh Circuit has adopted a more relaxed standard which requires that plaintiffs show ascertainability by "defining classes clearly and with objective criteria."  Mullins v. Direct Digit., LLC, 795 F.3d 654, 672 (7th Cir. 2015).  Courts in this district typically rely on the Seventh Circuit's articulation.  See In re EpiPen, 2020 WL 1873989, at *11; In re: Syngenta AG MIR 162 Corn Litig., No. 14-MD-2591-JWL, 2016 WL 5371856, at *3 (D. Kan. Sept. 26, 2016).

Here, the final payment schedule in the Settlement contained 4,307 owner numbers, corresponding to approximately 2,600 participating class members.  Plaintiffs claim that class members are easily ascertainable because when Merit acquired Oxy's assets in the Kansas Hugoton Field, Oxy provided Merit with royalty payment records and current royalty payment information, as well as its oil and gas leases and records regarding property ownership.  Plaintiffs therefore argue that class members are readily ascertainable from Merit's business records.  They suggest no alternative methodology.  As noted, defendants argue that under the proposed definition, class members are not ascertainable because to ascertain class members, they would need to conduct an individualized land-ownership analysis to determine who has standing to assert a claim for breach of the Settlement.

Specifically, defendants argue that (1) Merit's payment records do not tie payees to specific oil and gas leases; (2) payees may not be the current record and legal title owners to the mineral interests under the oil and gas leases, and therefore entitled to royalty payments; (3) a successor in interest to a participating class member in the Settlement may not have also acquired the alleged class claim for underpayment of royalties; (4) the class definition is unclear whether plaintiffs are making a claim related to the wells that have been drilled on Oxy lease properties after 2008; and

(5) Merit's payments on former Oxy properties also include some royalty payees and payments where Merit's interests are not derived from the Oxy acquisition, but from some other acquisition, direct leasing by Merit or unleased and/or unknown mineral owners. Defendants assert that given these issues, ascertaining class members would require the parties to conduct a manual individualized investigation of title and transfer documents for each payee.

Defendants present the Declaration of Mary Drennan, Merit's Division Order Manager. See Declaration Of Mary Drennan (Doc. #103-1) filed March 21, 2024. The Division Order department maintains records, including the names, addresses and decimal ownership interests of owners in wells, which it uses to distribute payments to all mineral interest owners. Drennan attests that Merit's royalty payment records alone do not establish class members because the payment records do not tie payees to specific oil and gas leases. Accordingly, Merit cannot identify payees who have received royalty payments since 2017 under oil and gas leases that Merit acquired from Oxy in 2014. To gather such information, Merit would need to pull information from individual Division Order and contract files to determine whether a payee is an owner under an oil and gas lease acquired from Oxy. To further complicate the inquiry, Merit's payments on former Oxy properties also include some royalty payees and payments where Merit's interests are not derived from the Oxy acquisition, but from some other acquisition, direct leasing by Merit or unleased and/or unknown mineral owners.

Drennan states that even if Merit could identify individuals who received royalties on leases acquired from Oxy, the payees may not be the current record and legal title owners under the oil and gas leases and may not be entitled to royalty payments. Because Merit relies on mineral interest owners to inform it of ownership transfers, Merit's files often do not reflect the legal chain of title. Even if Merit's own files could identify these interests, it would require a manual

individualized investigation of any actual transfer documents—and during discovery, Merit produced a total of 14,392 transfer documents, comprising 69,594 pages. The parties would also need to conduct title searches in public records and locate and examine files containing records of transfers by court orders (such as probate decrees) and representations by payees about title transfers. Moreover, Drennan contends that the parties would need to retain title attorneys to provide title opinions.

Drennan also states that annually, Merit pays unclaimed gas proceeds in 50 states based on the last known state of residence of the interest owners whose funds have been held in suspense and met the conditions for abandonment. Drennan asserts that if an owner has proceeds which are sent to state unclaimed property funds, serious doubt exists whether that person is still a title owner and entitled to the funds.

Drennan believes that for all the above reasons, Merit is paying royalties to a significant number of persons and entities who are not the title owners of interests, but the payees never disclosed that they are not the title owners or that they transferred their interests. Plaintiff R.W. Lucas demonstrates this exact problem. In his deposition, Lucas testified that Merit sends all royalty checks to him personally, not the Lucas Living Trust, even though the Lucas Living Trust is the legal owner of the mineral interests. See Deposition Of Ronald Wayne Lucas (Doc. #103-18) filed March 21, 2025 at 59:1–60:5. Lucas testified that he never informed Oxy or Merit of his transfer to the Trust.

Defendants also present the declarations and reports of their three retained experts, Angela Paslay, David Bengston and Joe Leon.[4] See Declaration Of Angela Paslay (Doc. #103-3), Declaration Of David E. Bengston (Doc. #103-4) and Declaration Of Joe Leon (Doc. #103-5), all

---

[4]     Plaintiffs have not challenged the expert opinions of Paslay, Bengston or Leon.

filed March 21, 2025. Paslay is a Director at Applied Economics Consulting Group, Inc., which conducts economic, accounting and financial analyses in the oil and gas industry. In her opinion, plaintiffs cannot identify class members by looking at Merit payment records but would need to conduct an individualized examination of ownership and pooling records. Paslay also notes that since 2008, hundreds of new wells have been drilled on Oxy's lease properties and (1) it is unclear whether plaintiffs are making a claim related to the new wells and (2) if they are, the parties would need to complete an individualized examination of production records to determine whether the wells were drilled above or below the Panoma-Council Grove Field horizon and within the areal confines of the Hugoton Gas Field such that they fall within the scope of the Settlement.

Bengston is an attorney at Stinson LLP, with substantial experience in oil and gas title work. In his opinion, plaintiffs cannot identify class members by looking at Merit payment records because the payment records do not (1) account for intervening ownership changes; (2) reflect ownership changes not reported to Merit; or (3) account for informal title transfers reported to Merit which may not satisfy legal transfer requirements. Moreover, Bengston opines that because a successor in interest may not have also acquired the alleged class claim for underpayment of royalties, an individualized examination of transfer documents is necessary to determine ownership of those claims.

Leon is a Project Manager at Western Land Services, LLC, with substantial experience in the oil and gas industry performing detailed title searches, acquiring oil and gas leases and conducting title curative work related to ownership claims for mineral royalty interests. In his opinion, the proposed class definition raises the following issues: (1) determining the successors of the 19 individuals who opted out of the Settlement; (2) identifying royalty owners and tying them back to specific leases acquired from Oxy; and (3) determining whether royalty owners are

subject to other leases acquired from producers other than Oxy.

On this record, plaintiffs have not met their burden of showing that class members are presently ascertainable based on the proposed class definition.  Plaintiffs present no rebuttal expert evidence that class members are ascertainable and contend that they do not need an expert because they can simply use Merit's royalty payment records.  Plaintiffs claim that tying specific royalty owners to specific leases is irrelevant to determining class membership.

The Court disagrees.  Class membership is wholly premised on whether class members own mineral interests in land burdened by oil and gas leases which Merit acquired from Oxy in 2014.  To determine that, however, is not administratively feasible.  The Court would have to individually inquire into Merit's payment records, lease records and acquisition records, along with public land records and relevant transfer documents for each payee.  Given the significant hurdles of determining ownership interests and tying the interests back to specific leases, plaintiffs have not clearly defined their class, and the Court cannot presently apply the class definition to determine who is and who is not a member of the class.  See Evans, 2023 WL 3262012, at *6 (from tuition records alone, court could not ascertain class members without individualized inquiries); see also EQT Prod. Co. v. Adair, 764 F.3d 347, 359 (4th Cir. 2014) (class members not ascertainable from gas estate ownership schedules because numerous heirship, intestacy and title-defect issues plague many potential class members' claims to gas estate); Johnson v. Kan. City S., 224 F.R.D. 382, 389 (S.D. Miss. 2004) (ascertaining class members would require individualized review of thousands of title documents containing differing and diverse conveyance language that would have to be analyzed according to specific language used and applicable case law to ascertain intention of parties to conveyances and legal effect of instruments), aff'd sub nom. Johnson v. Kan. City S. Ry. Co., 208 F. App'x 292 (5th Cir. 2006).  Plaintiffs suggest no alternative methodology

to ascertain class members without such individualized inquiries.

For these reasons, the Court finds that under the present definition, class members are not reasonably ascertainable, and class certification is inappropriate in this case.

### 2. Commonality

Rule 23(a)(2) requires plaintiffs to show that "questions of law or fact are common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." Dukes, 564 U.S. at 349–50 (quotations omitted). The requirement that class members have suffered the same injury "does not mean merely that they have all suffered a violation of the same provision of law." Id. at 350. Rather, plaintiffs must show that the class's claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.

Plaintiffs bring one claim for breach of contract against Oxy and one claim for breach of contract against Merit. Plaintiffs assert that the following questions of fact or law are common to all members of the proposed class:

1. Has Merit Energy or Merit Hugoton taken improper deductions for gathering charges in excess of the limit of $0.15/mmbtu and the prohibitions on fuel deductions set forth in the Settlement?

2. Is Merit Energy and/or Merit Hugoton bound by the terms of the Settlement?

3. Is Oxy bound by the terms of the Settlement?

4. Has Merit Energy or Merit Hugoton breached the terms of the Settlement?

5. Has Oxy breached the terms of the Settlement?

Motion For Class Certification (Doc. #89) at 8. Plaintiffs' first, fourth and fifth questions are

essentially the same breach of contract claims against three different parties.

Defendants argue that plaintiffs' common questions cannot be answered the same for all proposed class members. Specifically, defendants argue that plaintiffs' questions necessarily turn on individualized inquiries: (1) whether the class members are legal owners of mineral interests burdened by oil and gas leases which Merit acquired from Oxy; (2) if the owners transferred their interests, whether they also assigned their class claim for underpayment of royalties; and (3) whether the terms of each individual lease address defendants' waiver and estoppel defenses. Moreover, defendants assert that Merit's alleged deductions will vary from one well to another and from one gathering system to another, such that questions on deductions cannot be answered the same for all class members.

Plaintiffs' second and third questions are purely legal questions which the Court could answer based on the terms of the Settlement and Merit and Oxy's acquisition documents; it would not need to consider the proposed members' individual circumstances. The Court agrees with defendants, however, that due to individual inquiries related to property ownership and deductions, plaintiffs' first, fourth and fifth "common" questions will not yield the same answer for each proposed class member. Despite the second and third questions being purely legal questions, the answer to the questions would not resolve each class members' claims in one stroke. As discussed, plaintiffs' proposed class may include individuals without standing to enforce the Settlement, meaning that they have no claim for breach of contract. Without a claim for breach of contract, whether the Settlement binds Merit or Oxy is irrelevant and will not determine the truth or falsity of an issue central to breach of contract. Accordingly, plaintiffs' proposed common questions would not resolve an issue that is central to each proposed class members' claims. Plaintiffs have not satisfied the commonality requirement.

### 3.     Typicality

Rule 23(a)(3) requires plaintiffs to show that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The test of typicality is whether all class members were at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances. Stricklin, 594 F.3d at 1198–99. The interests and claims of named plaintiffs and class members need not be identical; so long as the claims of named plaintiffs and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality. Id.

Here, plaintiffs' legal and remedial theories may not be identical to those of the proposed class because, for reasons stated above, the proposed class includes members who may not have legal title to the mineral interests burdened by oil and gas leases which Merit acquired from Oxy or own the class claim for underpayment of royalties. Therefore, plaintiffs' proposed class of royalty owners includes individuals who may not have standing to enforce the Settlement and have no legal or remedial theory on which to bring suit. For example, The Lucas Living Trust would not even be a class member, given that it has not received royalty payments from Merit during the requisite time period, even though it is the legal owner of the mineral interests. Moreover, plaintiffs' claims are not typical of the claims of royalty owners whose names are attached to unclaimed royalties sent to the states. For these reasons, plaintiffs' claims are not typical of the proposed class.

### 4.     Adequacy

To satisfy the final requirement of Rule 23(a), plaintiffs must demonstrate that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court considers two questions when determining adequacy of representation: (1) whether the named

plaintiffs and their counsel have any conflicts of interest with other class members and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187–88 (10th Cir. 2002). Here, plaintiffs have not satisfied the commonality or typicality requirements due to individualized issues related to mineral interest ownership and class claim ownership. See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1219 (10th Cir. 2013) (commonality, typicality and adequacy requirements of Rule 23(a) "tend to merge"). Given the variance in claims, plaintiffs do not necessarily possess the same interests as other class members, and they would not fairly and adequately protect the interests of the entire class. The named plaintiffs are not adequate representatives of the proposed class.

      C.     Rule 23(b)(3) Requirements

Under Rule 23(b), the Court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

      1.     **Predominance**

Rule 23(b)(3) requires plaintiffs to "show that common questions subject to generalized, classwide proof predominate over individual questions." CGC Holding Co. v. Broad & Cassel, 773 F.3d 1076, 1087 (10th Cir. 2014). The predominance inquiry looks to "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the noncommon, aggregation-defeating, individual issues." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016). The Court should "characterize the issues in the case as common or not, and then weigh which issues predominate." CGC Holding, 773 F.3d at 1087. Common issues are

those for which "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." Tyson Foods, 577 U.S. at 453.

Here, plaintiffs have presented no questions common to all proposed class members. Accordingly, common questions do not predominate. Even if plaintiffs could point to a single common question, individual issues related to ownership of the mineral interests would significantly outweigh any common issue. See XTO Energy, Inc., 725 F.3d at 1218–19 (individualized issues predominate when duty of marketability requires reviewing every class members' lease); Foster v. Merit Energy Co., 282 F.R.D. 541, 560 (W.D. Okla. 2012) (plaintiffs fail to establish predominance when method for calculating royalty payments depended on varying terms of lease agreements). Plaintiffs have not satisfied the predominance requirement.

## 2. Superiority

To establish superiority under Rule 23(b)(3), plaintiffs must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In making this determination, the Court considers (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). Here, plaintiffs cannot show that common issues predominate, that their claims are typical of the proposed class or that they could adequately represent the proposed class. Furthermore, even ascertaining the members of the class could present challenges which swallow any perceived benefits of classwide adjudication. For all the reasons discussed above, plaintiffs cannot show that a class action is the superior method to efficiently resolve whether Merit and Oxy

breached the terms of the Settlement agreement by taking improper deductions from plaintiffs' royalty payments.

On the facts before the Court, plaintiffs have not established that the proposed class satisfies all requirements of Rule 23.  The Court overrules plaintiffs' motion for class certification.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion For Class Certification (Doc. #89) filed January 9, 2025 is **OVERRULED.**

**IT IS FURTHER ORDERED** that Defendants' Motion To Strike The Expert Opinions Of Paul Saas As An Improper Rebuttal Witness (Doc. #90) and Defendants' Daubert Motion To Exclude The Opinions Of Paul Saas (Doc. #91), both filed January 9, 2025, are **OVERRULED as moot**.

Dated this 18th day of June, 2025 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge